**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CHRISTINE L. MULLINS,                     )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )      No. 09 C 7573
                                          )
TARGET CORPORATION,                       )
                                          )
            Defendant.                    )


**MEMORANDUM OPINION**

Before the court are three motions: defendant's motion for summary judgment; plaintiff's motion for entry of an order conditionally certifying a FLSA collective action and for notice to issue; and defendant's motion to strike declarations submitted in support of plaintiff's motion. For the reasons explained below, defendant's motion for summary judgment is granted; plaintiff's motion for conditional certification is denied; and defendant's motion to strike is denied.

**BACKGROUND**

Plaintiff Christine L. Mullins was employed by defendant Target Corporation ("Target") from July 28, 2002 to November 3, 2009. She sues Target for unpaid overtime wages under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 et seq., and the Illinois Minimum Wage Law, 820 ILCS 105/1 et seq. Mullins brings the action individually and on behalf of all others who were

employed by Target as "Investigators." Mullins moves for conditional approval of a collective action under section 16(b) of the FLSA, 29 U.S.C. § 216(b), which allows employees to act together against an employer to recover unpaid overtime compensation. "The conditional approval process is a mechanism used by district courts to establish whether potential plaintiffs in the FLSA collective action should be sent a notice of their eligibility to participate and given the opportunity to opt in to the collective action." Ervin v. OS Rest. Servs., Inc., 632 F.3d 971, 974 (7th Cir. 2011).

Target moves for summary judgment on both of plaintiff's claims. At issue is whether the FLSA exempts Mullins from eligibility for overtime under the "administrative employee" provision.[1] We will discuss Target's motion first.

## DISCUSSION

### A. Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom

---

[1] "The overtime provision of the Illinois Minimum Wage Law, 820 ILCS 105/4a(1), is parallel to that of the FLSA, and Illinois courts apply the same principles . . . to the state provision." Urnikis-Negro v. American Family Prop. Servs., 616 F.3d 665, 672 n.3 (7th Cir. 2010).

in the light most favorable to the nonmoving party.  See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  "Summary judgment should be denied if the dispute is 'genuine':  'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question."  McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by citing to particular parts of materials in the record or by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required," we may give an opportunity to properly support or address the fact, consider the fact undisputed for purposes of the motion, grant summary judgment if the motion and supporting materials show that the movant is

entitled to it, or issue any other appropriate order. Fed. R. Civ.
P. 56(e).

**B.**   <u>**Relevant Facts**</u>

Before discussing the facts of this case, we will address
Target's contention that many of plaintiff's responses to Target's
Local Rule 56.1 Statement of Facts do not comply with the local
rule because they (1) are argumentative; (2) do not fairly dispute
the substance of the facts asserted; and (3) include additional
information that is unrelated to the fact asserted.

"The purpose of the 56.1 statement is to identify for the
Court the evidence supporting a party's factual assertions in an
organized manner: it is not intended as a forum for factual or
legal argument." <u>Malec v. Sanford</u>, 191 F.R.D. 581, 585 (N.D. Ill.
2000).   A Rule 56.1 response is not the place for "purely
argumentative denials," <u>id.</u> at 584, or "evasive denials that do not
fairly meet the substance of the material facts asserted," <u>Bordelon</u>
<u>v. Chicago Sch. Reform Bd. of Trs.</u>, 233 F.3d 524, 528 (7th Cir.
2000).   "[D]istrict courts are entitled to expect strict compliance
with Local Rule 56.1 . . . ." <u>Raymond v. Ameritech Corp.</u>, 442 F.3d
600, 604 (7th Cir. 2006).

We will not discuss each of plaintiff's responses
individually, but we agree with Target that the responses to
Statements 8, 11-24, 26, 27, 34, 35, and 44-46 are evasive,
argumentative, and needlessly prolix.   In some instances, as

discussed below, plaintiff denies the substance of statements that she admitted in her deposition. To the extent warranted, we have disregarded the non-compliant portions of plaintiff's responses to defendant's Rule 56.1 statements.

The following facts are undisputed (or not properly disputed). Target is a national retailer of consumer goods. To protect against the theft of assets and to minimize lost revenue from theft, Target has an Assets Protection division. The mission of the Assets Protection team is to "enhance profitability, the [customer] experience and [Target's] reputation by minimizing loss and business disruptions and providing safe and secure environments." (Pl.'s Resp. to Def.'s Rule 56.1 Statement of Facts ("SOF") ¶ 6; Dep. of Christine L. Mullins, Ex. 10, Investigator Job Description.)

On July 28, 2002, Mullins began working for Target as an Assets Protection Team Leader, a position that was treated as exempt from overtime pay. On October 3, 2004, Mullins was promoted to Investigator, the position at issue in this litigation. Target Investigators receive extensive training, including "Assets Protection Basic Academy Training," which includes a learning plan consisting of lessons designed to address Investigators' roles. As part of the plan, Investigators are instructed on (among other things) apprehending suspects, conducting interviews, and conducting surveillance.

As an Investigator, Mullins identified and conducted investigations of fraud and theft related to Target's business at several stores in southern Chicagoland and northern Indiana. (Mullins Dep. at 86-87, 89-91, 273.)  Her job entailed several duties, as Mullins described in her deposition:

I was not responsible for just one particular store.  I was responsible for an area.  So I was responsible for gathering all of the information [relating to theft and fraud], all of the data, that was put in[to the Target database] by other stores.
   So if all the stores were putting in information, I would go through and kind of analyze all of the data that was in there and kind of pull things out that I believe could be a case or that [sic] tips that came in on a particular shoplifter or a location or information that a shoplifter gave, then I would pull that information off of the database and kind of analyze it and see if there was a case to be made.
. . .
Q. [W]hat training did you . . . need [to move into the Investigator position]?
A.  Well, on how to run an investigation. . . .
Q.  What's entailed with running an investigation?
A.  Analyzing data, pulling information, reviewing it.
Q.  Is that it?
A.  No.  After you have the data and you've maybe developed a case, then it's brought to your supervisor for him to approve.  And then if he approves it as a case, then you go back and you start running background checks, you run any information on it.  If it's a fencing location, you run a background check on the owner, you do surveillance, all of which needs to be approved before you do it.  So if, if I pull enough information saying that we have five reports on this one fencing location, then I'd bring it to my supervisor and say, "You know, there's five reports on this location.  I'm recommending that I go out and do a drive-by of the location and check on the address and verify it."  And then he then [sic] approves it.
   So from that point then you come back and you move to the next case--step in your case, whether it's pulling more background checks, reviewing any video from stores, see if there's anybody else involved.  And then once you

have that, then get it approved by your supervisor and
then conduct, like, a stationary surveillance on the
store.  If your boss--if your supervisor approves that,
then you go out and do surveillance on it.  Then you
bring back your findings.  If they feel that it's
significant, yes, or they--you did see something that
shows that it created a loss for your company, the
Target, then he would approve you to go out and do more
surveillance or then at that point then bring it to law
enforcement.
　　　　And then if you bring it to law enforcement and they
approve it, then you go out with them--once again, it's
approved by your supervisor to go out with law
enforcement--to either do controlled sales or just make--
or do a buy bust and then make the arrest.

(Mullins Dep. at 86-87, 89-91.)

　　　　Mullins agreed that it was her job in the first instance to
"analyze all of the information" she had before her, "evaluate
potential strategies for approaching the investigation," and "come
up with a recommendation" that she then presented to her
supervisor, the Investigations Team Leader.  (Mullins Dep. at 69.)
She prepared her recommended approach in a case plan, which was
documented in Target's computerized case management system, and
then used the system to document her investigative progress.  When
investigating, in addition to analyzing data from stores and
conducting surveillance, Mullins also relied on tactics such as
using informants, performing "trash pulls," and setting up
controlled sales.  She also interviewed informants and suspects.
Mullins oversaw two to four cases at one time; some were simple and
others were more complex.  In certain investigations that Mullins
conducted (working with other employees of the asset protection

division and with law enforcement), Target recovered thousands of dollars (or more) of lost revenue. (Mullins Dep. at 153.) For example, Mullins was the lead investigator in the so-called "1812" case, in which approximately $1.2 million in merchandise was recovered and a criminal warehouse operation that had operated for more than five years was shut down. (Mullins Dep. at 201-02.)

## C. <u>Administrative Employee Exemption</u>

The FLSA exempts from overtime pay coverage those employed in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The burden is on the employer to prove by a preponderance of the evidence that an employee is exempt under the FLSA. <u>Schmidt v. Eagle Waste & Recycling, Inc.</u>, 599 F.3d 626, 631 (7th Cir. 2010).

The relevant regulation sets forth a three-part test for determining whether an employee falls under the "administrative employee" exemption. Target is entitled to summary judgment only if it establishes that there is no genuine issue that plaintiff meets each element of the test. The first element is that the employee must be compensated on a salary or fee basis at a rate of not less than $455 per week. 29 C.F.R. § 541.200(a)(1). This requirement is not in dispute; Mullins's earnings exceeded the threshold amount. The second and third requirements, however, are in dispute.

The second requirement is that the employee's primary duty must be the performance of office or non-manual work "directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). To meet this test, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).

In Target's view, Mullins's primary duty was "to analyze data and store trends to identify and investigate meaningful threats to Target's retail business, and implement a strategy to effectively reduce shrinkage, theft, and organized retail crime to protect Target's assets and provide a safe retail environment." (Def.'s Mem. in Supp. of Mot. at 6.) Target contends that this was non-manual work directly related to assisting with the servicing of its retail business, considering that plaintiff was not producing or selling its goods.

Plaintiff makes several arguments about what her primary duties *did not* include, but fails to expressly define her primary duty or duties. She does assert that her job "at its core" was "to report unvarnished facts as they are gathered throughout the course of the investigation to law enforcement, and to Investigation Team Leaders ("ITLs") who alone, or in conjunction with [their

supervisors] make all significant decisions on the files." (Pl.'s Mem. in Opp'n to Mot. at 2.) Similarly, plaintiff contends that Investigators "gather facts about the theft of Defendant's merchandise, and with the approval of their ITLs, give the unvarnished facts to law enforcement, all in connection with Defendant's goal that the thieves will be prosecuted." (Pl.'s Mem. at 12.) In another section of plaintiff's brief, she lists the "primary duties of an investigation" as "initial case review and plan," reporting, interviews, surveillance, and referral to law enforcement. (Pl.'s Mem. at 5.) Plaintiff also argues in a conclusory fashion that Investigators "do not service the retailer-Defendant in the sale of merchandise." (Pl.'s Mem. at 12.)

Given the description of her job duties that Mullins provided at her deposition, quoted above, we believe that Target's definition of her primary duties is accurate, albeit wordy.[2] It is clear from Mullins's admissions that she did not merely "gather facts" and present them to law enforcement. She analyzed data submitted by stores, identified possible investigations of theft,

---

[2]  We do not, however, agree with Target that Juback v. Radioshack Corp., No. 8:08-cv-768-T-24TBM, 2009 WL 1259990 (M.D. Fla. May 6, 2009) and U.S. Dep't of Labor Wage & Hour Div. Op. Ltr., No. FLSA 2006-30 (Sept. 8, 2006) are "squarely on point," Def.'s Mem. at 5.  The employees' primary duties in Juback and in the DOL Letter are distinguishable.  Although Juback investigated theft and fraud, he was a Loss Prevention Manager in charge of 263 Radio Shack stores and managed seven other managers.  Juback had a higher-level position and broader responsibilities than Mullins.  The employee at issue in the DOL Letter also had different responsibilities.  He was a Loss Prevention Manager ("LPM") whose primary function was "the effective implementation of a loss prevention and shortage control program for the store where the LPM [was] employed." (Def.'s Mem., Ex. A, Op. Ltr. at 1.)  The employee's duties related more to management, accounting, and auditing than to investigation.

and conducted investigations.[3]  There is no dispute that this work
was non-manual.    The  next  question is whether plaintiff's
primary duties were directly related to assisting with the general
business operations of Target or the running or servicing of its
business. The relevant Department of Labor regulation explains that
this type of work

> includes, but is not limited to, work in functional areas
> such as tax; finance; accounting; budgeting; auditing;
> insurance; quality control; purchasing; procurement;
> advertising; marketing; research; safety and health;
> personnel management; human resources; employee benefits;
> labor relations; public relations, government relations;
> computer network, internet and database administration;
> legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b).  Mullins's work did involve, in part,
safety and governmental relations.  Although asset protection and
recovery is not included, the list is non-exclusive, and we think
that this type of work is in a "functional area" similar to those
listed.   It is undisputed that Mullins did not participate in
rendering the service that Target offers to the public, which is
the sale of retail goods.   Instead, she assisted in "servicing"

---

[3]    In addition to her investigative work, plaintiff (along with
co-workers) developed the content for and taught a class on organized retail
crime to law enforcement officers at the Northern Indiana Law Enforcement
Academy.  (Mullins Dep. at 199, 219.)  Mullins also helped to train other
Investigators, and during a portion of her employment as an Investigator (from
roughly 2004 to 2008), Mullins supervised three Investigations Specialists.
Mullins directed their activities, evaluated their performance, and made
recommendations concerning hiring, discipline, and termination.  (Mullins Dep.
at 137-139, 189, 205-06.)  We do not consider this work in our analysis, however,
because neither party contends for purposes of this motion that it should be
considered part of plaintiff's *primary* job duties.

Target's retail operations by investigating and preventing theft
and fraud.

Plaintiff fails to develop her conclusory argument that her
duties were not related to the "servicing" of Target's business.
She cites, without discussion, a provision of the regulations that
excludes certain workers from the administrative exemption:

> The section 13(a)(1) exemptions and the regulations in
> this part [] do not apply to police officers,
> detectives, deputy sheriffs, state troopers, highway
> patrol officers, investigators, inspectors, correctional
> officers, parole or probation officers, park rangers,
> fire fighters, paramedics, emergency medical
> technicians, ambulance personnel, rescue workers,
> hazardous materials workers and similar employees,
> regardless of rank or pay level, who perform work such
> as preventing, controlling or extinguishing fires of any
> type; rescuing fire, crime or accident victims;
> preventing or detecting crimes; conducting
> investigations or inspections for violations of law;
> performing surveillance; pursuing, restraining and
> apprehending suspects; detaining or supervising
> suspected and convicted criminals, including those on
> probation or parole; interviewing witnesses;
> interrogating and fingerprinting suspects; preparing
> investigative reports; or other similar work.

29 C.F.R. § 541.3(b)(1). This regulation does not apply to
plaintiff, who was a private-sector investigator. We agree with
the court in Foster v. Nationwide Mutual Insurance Co., 695 F.
Supp. 2d 748, 757-58 (S.D. Ohio 2010), that "[w]hen this reference
to 'investigators' is read in the context of the entire regulation,
it is clear that the regulation pertains to law enforcement and
safety personnel--not those who perform investigative duties in the
private sector." The Foster court explained that the exemptions

are inapplicable to employees in law-enforcement roles because
their agencies are in the business of conducting investigations, so
their work falls "squarely on the production side of the line."
Id. at 758 (citing Reich v. New York, 3 F.3d 581, 587 (2d Cir.
1993)).[4]  Because plaintiff's primary duties were directly related
to Target's general business operations, the second requirement of
the administrative employee exemption is satisfied.

The third requirement of the exemption is that the employee's
primary duty includes the exercise of discretion and independent
judgment with respect to matters of significance.  29 C.F.R. §
541.200(a)(3).   Generally, "the exercise of discretion and
independent judgment involves the comparison and the evaluation of
possible courses of conduct, and acting or making a decision after
the various possibilities have been considered."  29 C.F.R. §
541.202(a).  Multiple factors are relevant to this consideration,
including

> whether the employee has authority to formulate, affect,
> interpret, or implement management policies or operating
> practices; whether the employee carries out major
> assignments in conducting the operations of the
> business; whether the employee performs work that
> affects business operations to a substantial degree,

___

[4]  For this reason, a number of the cases and DOL opinion letters cited
by plaintiff or attached to her brief are inapposite.  In U.S. Dep't of Labor
Wage & Hour Div. Op. Ltr., 2005 WL 3308592 (Aug. 19, 2005); U.S. Dep't of Labor
Wage & Hour Div. Op. Ltr., 1998 WL 852783 (Apr. 17, 1998); U.S. Dep't of Labor
Wage & Hour Div. Op. Ltr., 1998 WL 852752 (Jan. 23, 1998); U.S. Dep't of Labor
Wage & Hour Div. Op. Ltr., 1997 WL 971811 (Sept. 12, 1997); Ahle v. Veracity
Research Co., 738 F. Supp. 2d 896 (D. Minn. 2010); and Gusdonovich v. Business
Information Co., 705 F.Supp. 262 (W.D. Pa. 1985), the employers were engaged in
the business of conducting investigations, so the employee-investigators were
performing the day-to-day "production" functions of the business.

even if the employee's assignments are related to
operation of a particular segment of the business;
whether the employee has authority to commit the
employer in matters that have significant financial
impact; whether the employee has authority to waive or
deviate from established policies and procedures without
prior approval; whether the employee has authority to
negotiate and bind the company on significant matters;
whether the employee provides consultation or expert
advice to management; whether the employee is involved
in planning long- or short-term business objectives;
*whether the employee investigates and resolves matters
of significance on behalf of management*; and whether the
employee represents the company in handling complaints,
arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b) (emphasis added).

Target maintains that Mullins exercised independent judgment
and discretion in identifying and selecting strategies and tactics
for investigations. Plaintiff submits that she worked only "within
the strict confines of Defendant's training programs, the Assets
Protection and Investigations Directives and their [sic] Achieving
Excellence reviews" and that her work was reviewed by supervisors
every step of the way. (Pl.'s Mem. at 13.) Plaintiff notes that
Investigators must report on investigations on a regular basis in
Target's electronic reporting system and that the Assets Protection
Directives preclude Investigators from including their subjective
opinions and conclusions in their reports. She also contends that
Investigators use "scripted approaches" in interviewing suspects
and informants. According to plaintiff, Target's Directives and
the "extensive training" Investigators receive in "standard, finite

tactics" leave no "residual discretion" for Investigators to exercise.  (Pl.'s Mem. at 22.)

The extent to which plaintiff now downplays her use of judgment and discretion is at odds with her deposition testimony. In her deposition, plaintiff acknowledged that when she initially reviewed and analyzed data from the stores in her area, she made a judgment about whether particular data or a pattern in the data warranted further investigation.  (Mullins Dep. at 92.)  She conceded that Target's guidelines permit Investigators to make choices about using particular courses of conduct and/or investigative tactics, such as mobile surveillance.  (Mullins Dep. at 145, 159.)  Notwithstanding that there are only so many tactics to choose from, Investigators use their judgment to decide which ones to employ.  Plaintiff also testified that while she was often assigned cases, she sometimes had the discretion to keep a particular case and work on it herself or to "pass it on to somebody else."  She made this decision based on the location of the events in the case and/or the type of case; she typically favored fencing cases over "eBay cases" and check-fraud cases. (Mullins Dep. at 192-195.)

Mullins exercised independent judgment and discretion not only in selecting cases and in planning out strategies and tactics for investigations, but in carrying out those investigations.  She admitted that during mobile surveillance, she used judgment in

deciding whether a particular vehicle was "worth following." (Mullins Dep. at 106-07.) As for interviews, she testified that there was a script of questions that she had memorized and used when conducting interviews of suspects or witnesses, but acknowledged that she asked follow-up questions that were not scripted and that she decided which follow-up questions to ask. (Mullins Dep. at 207-08.)[5] One interview that Mullins participated in lasted for over seven hours. (Mullins Dep. at 41.)

Although Target's Directives prohibit Investigators from including their subjective assessments in case reports, Investigators are not prohibited from otherwise sharing their views and opinions. Mullins testified that she presented her subjective views to her supervisor, Mullins Dep. at 60, 92, 173-74, and that during weekly group meetings, Investigators were expected to express opinions on whether investigations should be opened, Mullins Dep. at 272-73. When wrapping up an investigation, plaintiff made an initial determination concerning whether a case was ready to present to law enforcement and where (to which agency) to take the case. (Mullins Dep. at 117-18.) She also used her

---

[5] Plaintiff's brief refers to a "script provided by Defendant," Pl.'s Mem. at 7, and a "scripted approach," Pl.'s Mem. at 18, but plaintiff has not submitted any actual script. Included in Target's Instructor Guide for the Internal Interviewing course for Investigators, Pl.'s Rule 56.1 SOF, Ex. K, are sample interview questions for a role-playing exercise, but the document does not demonstrate a rigid, scripted approach to interviews. Rather, a general interviewing structure and suggested questions are presented. Target does admit that Investigators' Internal Interviewing training "includes what questions to ask" store employees who are suspected of theft, Def.'s Resp. to Pl.'s Rule 56.1 SOF ¶ 11.

judgment in deciding on whether to close investigations.  (Mullins

Dep. at 177.)

Plaintiff repeatedly emphasizes that in most instances, she

simply made recommendations to her supervisor, who occasionally did

not follow those recommendations, and that she lacked the authority

to make final decisions.  The regulations, however, provide that

the standard does not require that an employee have unlimited

authority:

> The exercise of discretion and independent judgment
> implies that the employee has authority to make an
> independent choice, free from immediate direction or
> supervision.  However, employees can exercise discretion
> and independent judgment even if their decisions or
> recommendations are reviewed at a higher level. Thus, the
> term "discretion and independent judgment" does not
> require that the decisions made by an employee have a
> finality that goes with unlimited authority and a
> complete absence of review.  The decisions made as a
> result of the exercise of discretion and independent
> judgment may consist of recommendations for action rather
> than the actual taking of action.  The fact that an
> employee's decision may be subject to review and that
> upon occasion the decisions are revised or reversed after
> review does not mean that the employee is not exercising
> discretion and independent judgment.

29 C.F.R. § 541.202(c).  It is not disputed that plaintiff was

required to obtain her supervisor's approval at a number of steps

in an investigation, but, as she testified, she also made choices

and decisions that were free from *immediate* supervision and

direction.  Plaintiff also complains that she was "micromanaged"

and that her choices were "scrutinized more" than those of other

Investigators, Mullins Dep. at 144, but admitted to several ways in which she used independent judgment and discretion nonetheless.

Likewise, plaintiff's extensive training and use of the directives that Investigators were expected to follow does not imply a lack of discretion or judgment. The training and directives, as well as performance reviews, guided plaintiff's conduct, but the evidence is that she and other Investigators did more than merely apply established procedures and techniques. By plaintiff's own admissions, she was much more than a fact-gatherer; rather, she compared and evaluated possible courses of conduct and made decisions after considering the possibilities. Her primary duties thus involved the exercise of discretion and independent judgment.

Furthermore, we conclude that there is no genuine issue that Mullins exercised this discretion and judgment with regard to matters of significance. "The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). The mission of Target's assets-protection employees is to "enhance profitability, the [customer] experience and Target's reputation." (Pl.'s Resp. to Def.'s Rule 56.1 SOF ¶ 6.) "Target has a substantial interest in protecting its merchandise from theft, fraud, and other business threats that can impair Target's ability to sell merchandise to its customers." (Def.'s Rule 56.1 SOF, Ex. A, Decl. of Mark Krause ¶

4.)   The investigations that Mullins conducted and sometimes led
had the potential to, and in some instances did, recover
significant assets for Target.   In her interrogatory answers,
Mullins disclaims responsibility for the recovery of thousands of
dollars of infant formula in the "1812" case, yet described closing
the case and recovering the assets as a "top accomplishment" at her
deposition when discussing one of her performance reviews:

> Q.   Is there anything in the narrative that your
>      supervisor wrote that you thought was unfair?
> A.   Yes.
> Q.   What?
> . . .
> A.   [M]y overall rating--he gives me a 75, but [if] you
> look at the top accomplishment, closing out 1812 and
> recovering $1.2 million in merchandise probably warrants
> more than a 75, because if you look at the year before,
> I got an 82, and I hadn't even closed that case yet.
> Q.   Well, but, haven't you told us today that well, you
> closed the 1812 case, the only way you closed it was
> because your boss told you everything you needed to do?
> A.   Well, he made--yes.  He did--
> Q.   So why should you get credit for it?
> A.   Because I was the Lead Investigator on the case.
> Q.   Right, but haven't you spent much of today tell[ing]
> us that you didn't really lead the investigation, your
> boss just told you what to do, and you just executed it?
> A.   No.   I le[]d the investigation.   I made my
> recommendations.   He gave his recommendations.

(Mullins Dep. at 210, 212-13 (discussing Ex. 8).)   The
uncontradicted evidence is that the plaintiff exercised discretion
and independent judgment with respect to matters of significance.

Because plaintiff was compensated on a salary or fee basis at
a rate of not less than $455 per week, her primary duty was the
performance of non-manual work directly related to Target's general

business operations, and her primary duty included the exercise of discretion and independent judgment with respect to matters of significance, we hold that there is no genuine issue that she was an exempt administrative employee.

In light of our ruling granting summary judgment in favor of Target, plaintiff's motion for conditional certification of a FLSA collective action and for notice to issue is denied as moot, and defendant's related motion to strike declarations is denied as well.

**CONCLUSION**

For the reasons explained above, defendant's motion for summary judgment [43] is granted; plaintiff's motion for conditional certification of a FLSA collective action and for notice to issue [20] is denied; and defendant's motion to strike declarations submitted in support of plaintiff's motion [41] is denied.


DATE:        April 13, 2011


ENTER:       _____
             John F. Grady, United States District Judge